THE UNITED STATES, APPELLANTS *vs.* ISAAC T. PRESTON, ATTOR-
NEY GENERAL OF LOUISIANA, APPELLEE.

The offence against the law of. the United States, under the seventh section of
the act of congress, passed the 2d of March 1807, entitled " an act to prohibit
the importation of slaves into any port or place within the jurisdiction of the
United States from and after the 1st of January 1808," is not that of importing
or bringing into the United States persons of colour with intent to hold or sell
such persons as slaves, but that of hovering on the coast of the United States
with such intent; and although it forfeits the vessel and any goods or effects
found on board, it is silent as to disposing of the coloured persons found on
board, any further than to impose a duty upon the officers of armed vessels
who make the capture to keep them safely, to be delivered to the overseers of
the poor or the governor of the state or persons appointed by the respective
states to receive the same. [65]
The Josefa Segunda, having persons of colour on board of her, was, on the 11th
of February 1818, found hovering on the coast of the United States, and was
seized and brought into New Orleans, and the vessel and the persons on board
were libelled in the district court of the United States of Louisiana, under the
act of congress of the 2d of March 1807. After the decree of condemnation
below, but pending the appeal to this court, the sheriff of New Orleans went
on, with the consent of all the parties to the proceedings, to sell the persons of
colour as slaves, and sixty-five thousand dollars, the proceeds, were deposited
in the registry of the court to await the final disposal of the law.
By the tenth section of the act of 30th of April 1818, the six first sections of the
act are repealed, and no provision is made by which the conaition of the per-
sons of colour found on board a vessel hovering on the coast of the United
States is altered from that in which they were placed under the act of 1807,
no power having been given to dispose of them otherwise than to appoint some
one to receive them. The seventh section of the act of 1818 confirms no
other sales previously or subsequently made under the state laws, but those
for illegal importation, and does not comprise the case of a condemnation
under the seventh section.
The final condemnation of the persons on board the Josefa Segunda took place
in this court on the 13th of March 1820, after congress had passed the act of
the 3d of March 1819, entitled " an act in addition to an act prohibiting the
slave trade," by the provisions of which persons of colour brought in under any
of the acts prohibiting traffic in slaves, were to be delivered to the president of
the United States to be sent to Africa. It could not affect them.
In admiralty cases a decree is not final while an appeal from the same is depend-
ing in this court, and any statute which governs the case must be an existing
valid statute at the time of affirming the decree below. If, therefore the per-
sons of colour, who were on board the Josefa Segunda when captured, had been
specifically before the court on the 13th of March 1820, they must have been
delivered up to the president of the United States to be sent to Africa, under
the provisions of the act of the 3d of March 1819, and therefore there is no

[United States *vs.* Preston.]

claim to the proceeds of their sale, under the law of Louisiana, which appropriated the same. The court do not mean to intimate that the United States are entitled to the money, for they had no power to sell the persons of colour. [65]

APPEAL from the district court for the eastern district of Louisiana.

The brig Josefa Segunda, a Spanish vessel, proceeding with a cargo of negroes from the coast of Africa to the island of Cuba, was captured on the 11th day of February 1818, off St. Domingo, by a regularly commissioned Venezuelan privateer, and on the 24th of the following April she was seized in the river Mississippi by custom house officers of the United States, carried to New Orleans, and there the vessel and negroes were libelled, at the suit of the United States, in the district court of the United States for the Louisiana district.

The libel alleged that the negroes were unlawfully brought into the United States, with an intent to dispose of them as slaves, contrary to the provisions of the act of congress passed March 2d, 1807, entitled an act to prohibit the importation of slaves, &c. 2 Story's Laws U. S. 1050. The libel was filed on the 29th of April 1818, and a claim was put in by the Spanish owners, alleging an unlawful capture of the brig; that the brig put into the Balize in distress, and without any intention to infringe or violate a law of the United States. The district court condemned the brig and effects found on board to the United States, and the claimants appealed to this court.

At February term 1820 of this court, the sentence of the district court of Louisiana was affirmed; the court having been of opinion that "the alleged unlawful importation could not be excused on the plea of distress;" and that "where a capture is made by a regularly commissioned captor, he acquires a title to the captured property, which can only be divested by recapture, or by the sentence of a competent tribunal; and the captured property is subject to capture for a violation by the captors, of the revenue, or other municipal laws, of the neutral country into which the prize may be carried." 5 Wheat. 338.

[United States *vs.* Preston.]

After the decree of the district court of Louisiana had been pronounced, and before the appeal to this court, the negroes found on board of the captured brig were, under the provisions of the fourth section of the act of congress, and under the act of the state of Louisiana passed the 13th of March 1818, delivered by the collector of the port of New Orleans to the sheriff of the parish of New Orleans; and they were by him sold for $68,000, and the proceeds lodged in the bank of the United States, subject to the order of the district court.

Upon the return of the cause to the district of Louisiana from this court, Mr Roberts, an inspector of the revenue, and others, who alleged that they had made "military seizures" subsequent to that of the officers of the customs, filed claims to the moneys which were the proceeds of the sales of the brig and "effects," and of the negroes. Mr Chew, the collector, conjointly with the naval officers, filed a like claim, and the court having dismissed the claims of Roberts and the asserted "military captors," and allowed those of the collector and other officers of the customs, the cause was again brought before this court. 10 Wheat. 312.

This court, at February term 1825, decided that "the district court under the slave trade acts, have jurisdiction to determine who are the actual captors, under a state law made in pursuance of the fourth section of the slave trade act."

The court also decided, that "under the seventh section of this act of the 2d of March 1807, ch. 77, the entire proceeds of the vessel are forfeited to the use of the United States, unless the seizure be made by armed vessels of the navy or by revenue officers; in which case distribution is to be made in the same manner as prizes taken from the enemy."

The court also decided, "that under the act of the state of Louisiana, of the 13th of March 1828, passed to carry into effect the fourth section of the act of 1807, and directing the negroes imported contrary to the act to be sold, and the proceeds to be paid, ' one moiety for the use of the commanding officer of the capturing vessel, and the other moiety to the treasurer of the charity hospital of New Orleans, for the use and benefit of the said hospital;' no other

person is entitled to the first moiety than the commanding officer of the navy or revenue cutter, who may have made the seizure under the seventh section of the act of congress."

The case having returned again to the district court of Louisiana, Mr Preston, as attorney general of that state, filed a claim on behalf of that state, setting forth the illegal importation of the negroes, that the greater part of them had been delivered over to the sheriff of New Orleans, that the sheriff had disposed of them under the law of the legislature of Louisiana, that the proceeds of the sale, $68,000, were brought into the district court by the order of the court, and that part of the same remains deposited in court. He insisted that the money belongs to the state, and has been brought into court contrary to law and the rights of the state, and prays for an account, and that the said money may be paid over to him, so far as the same had not been disposed of conformal ly to the laws of Louisiana.

In the district court this claim was opposed on behalf of the United States.

The decree of the court was in favour of the claim, and an appeal was taken by the district attorney of the United States to this court.

The case was argued by Mr Berrien, attorney general and Mr Livingston for the United States; and by Mr Jones for the appellee.

For the appellants it was contended :

1. That the proceedings in the district court of Louisiana, upon the claim of the appellee, were irregular, the matter being of admiralty jurisdiction, and they should therefore have been by libel and monition.

2. That all proceedings relative to the matter in dispute had been regularly terminated by a final judgment of the supreme court of the United States.

3. That by the judgment of the supreme court, the whole beneficial interest in the proceeds in question has been adjudged to the United States.

4. That with regard to that moiety of the proceeds, which,

by the law of Louisiana, was directed to be paid over to the treasurer of the charity hospital of New Orleans, the proper claimant was the treasurer.

5. That any claim of the attorney general of Louisiana to the money in the district court is unfounded; the sale of the negroes having been made without authority, and therefore void, and the whole amount of the sales having been paid without consideration; and as no title to the negroes was acquired by the purchase, the money belongs to those who paid the same to the sheriff of New Orleans. Upon this last point, and on no other, the opinion of the court was given.

For the United States it was argued, upon this point; that as the decision of this court in the case of the Josefa Segunda, reported in 5 and 10 Wheaton, had established the principle which ruled the case, that in reference to negroes brought into the United States under the circumstances attending their capture and introduction they were not placed under the power of the legislature of Louisiana, but for the purpose of being received by the sheriff of New Orleans for safe keeping; the sale made by the sheriff was invalid and without authority.

The provisions of the seventh section of the act of 1807 are repealed by the act of congress of 1819, "an act in addition to acts prohibiting the slave trade," 3 Story's Laws U. S. 1752.

By this act a change in the regulations before adopted by the United States in relation to persons of colour illegally introduced into the United States, was established.

The power given by the act of 1807 to the states to pass laws for the disposition of those persons was repealed by the act of 1819. The United States had before that time been unwilling to direct the mode in which those persons should be treated; and it was considered most proper to refer the same to the legislation of the particular states into which they might be brought. By the act of 1819 all such persons so found in the United States, were directed to be transported to Africa. That act authorises the president so to remove all negroes brought into the United States contrary to the act of 1807, and repeals all prior acts repugnant to its provisions. Be-

.fore the passage of the act of 1819 the negroes who were on board the Josefa Segunda had not been finally condemned; as there was an appeal from the decree of condemnation in the district court, depending and undecided, until February 1820.

Until the final condemnation by this court in 1820, the negroes remained in the hands of the sheriff of New Orleans, under the protection of the United States, not as the property of the United States or of Louisiana, but under their care. No rights were vested or could vest by the decree of the district court, as the appeal suspended the operation of that decree, until affirmed by this court in 1820.

The sale of the negroes did not and could not become valid by any consent of the parties before the district court. Until condemnation, undisturbed by an appeal, no rights existed in the court to order, or in the parties to consent to or authorise the sale.

When the case was disposed of in this court in 1820, the whole of the authority of the district court of Louisiana, which had been exercised in 1818, was at an end, and that court could not legally proceed in the case. The act of 1819 authorised the appointment of an agent, and provided funds for the purpose of removing all such persons, under the direction of the president of the United States, to Africa. It was a necessary consequence of this change in the policy of the government, that all the provisions of the law of 1807 repugnant to its purposes should be repealed, and they were repealed. The powers given to the courts to condemn, and the powers given to the states to legislate in reference to those persons, ceased at the passage of the law of 1819; and that law, notwithstanding the sale made by the sheriff, found those negroes among its objects, and it operated upon them fully and effectually. This court has decided that no effective disposition of them had been or could be made by the legislature of Louisiana, and they were consequently in the condition stated, and were the objects of the bountiful and liberal provisions of that law.

It cannot be maintained that the sale was authorised either by the act of 1807, or by the law of Louisiana. The act of

[United States *vs.* Preston.]

1807 gave no power to the court to consent to or order the sale, and Louisiana could not interfere until after a sentence of condemnation, which should be final.   The claimant, the Spanish owner of the brig could not give the right to sell. Such is the nature and such are the effects of admiralty proceedings.   It follows therefore, that the money now in controversy was paid without consideration ; it belongs to the purchaser of the negroes ; and it cannot therefore under any circumstances belong to the state of Louisiana.

The sale has been made in the execution of a special power delegated by congress to the legislature of Louisiana.

It is fully established by the decisions of this court that special powers must be strictly pursued and cannot be exceeded.   The act gave no other powers, and did not give this power.

If the negroes, instead of being sold, had been distributed among the parties to await the final decree, and after the act of 1819 had passed, the district court of Louisiana had ordered them to be delivered to the sheriff of New Orleans for sale ; looking to the provisions of the act of 1819 ; to the repeal of the act of 1807, giving the legislatures of the states power to order a sale of those persons ; to the provisions of the act of 1819 securing to them the privileges of freemen to be returned to their native country ; to the terms of that act which embrace negroes delivered to the officers of the United States before or after the date of this law ; could those persons be delivered to slavery ?  Would they not rather be subject to the order of the president to be returned to Africa ? Can an illegal sale change the rights of the negroes.

Mr. Jones, for the appellee, contended, that on the admissions of the counsel for the United States, if the act of 1819 did not operate on the case, one moiety of the money in dispute belonged to the charity hospital of New Orleans. The provisions of the act of 1807, taken together, forfeited the negroes, and gave the property in them or the proceeds of their sale to the state of Louisiana, by placing them at the disposition of the state.   By that law, the negroes were to remain subject to such regulations as the state may make

for the disposal of them. This gave the property in them to the state. Placing property at the disposal of a state necessarily gives the state the property. This flows essentially from the sovereign character of a state.

The provisions of the seventh section of the act of 1807, provide for the corporal delivery of the negroes to the state officers. In the custody of those officers they remained until condemnation, which, as soon as it occurs, reverts to the time of seizure. It gives no right, but ascertains it. The judicial proceedings confirm and improve it, but do not create it. The act of congress having declared to whose benefit the forfeiture incurred by the violation of its provisions shall accrue, and that being the state, the condemnation does but confirm it.

As to the invalidity of the sale, it was contended, that if the admiralty court had power to order a sale *pendente lite*, the agreement that the sale should be made was operative and equally effectual. The right of an admiralty court to do so exists under special circumstances: but consent supplied the necessity of such circumstances. It is to be presumed that there was an order of court to confirm the sale, as the money arising from it was deposited in the court under its order.

The property in the negroes having thus become that of the state of Louisiana, under the law of 1807; that state having appointed an officer to take charge of them, and legislated as to the disposal of them under the authority of that act; the district court having condemned the negroes before the law of 1819, and that condemnation having established judicially the right of the state at the time of seizure; the provisions of the law of 1819 could not affect rights thus given, vested and executed.

Mr Justice JOHNSON delivered the opinion of the Court.

The case of the Josefa Segunda has been twice already before this court: the first time upon the question of condemnation; the second, upon the application of several claimants to be preferred in the distribution of the proceeds.

It now comes up upon a claim to the proceeds of the sale of the persons of colour found on board at the time of the

seizure, interposed by the law officer of the state of Louisiana.

The vessel was condemned under the seventh section of the act of 1807, passed to abolish the slave trade. By the fourth section of the act, the state of Louisiana was empowered to pass laws for disposing of such persons of colour as should be imported or brought into that state, in violation of that law. The offence under the seventh section, on which this condemnation was founded, is not that of importing or bringing into the United States, but that of hovering on the coast with intent to bring in, persons of colour to be disposed of as slaves, contrary to law; and although it forfeits the vessel and any goods or effects found on board, it is silent as to disposing of the coloured persons found on board, any farther than to impose a duty upon officers of armed vessels, who may capture them, to keep them safely, to be delivered to the overseers of the poor, or the governor of the state, or persons appointed by the respective states to receive the same.

The state of Louisiana passed an act on the 13th of March 1818, which recites the provisions of the fourth and seventh sections of the acts of congress, and authorises and requires the sheriff of New Orleans to receive any coloured persons designated under either of those sections, and the same to keep, until the district or circuit court of the United States shall pronounce a decree upon the charge of illegal importation.

The second section makes provision for selling them upon receiving a certificate of such decision, and enjoins a distribution of the proceeds; one half to the commanding officer of the capturing vessel, the other to the treasurer of the charity hospital of New Orleans.

In pursuance of this law of the state, it appears, that after the decree of condemnation below, but pending the appeal in this court, the sheriff went on to sell, with the consent, it is said, of all parties; and $65,000, the sum now in controversy, was deposited in the registry of the court below, to await the final disposal of the law.

The 20th of April 1818, congress passed another act on

VOL. III.—I

this subject, by the tenth section of which, the six first sections of the act of 1807 are repealed.; but their provisions are re-enacted with a little more amplitude; and the fifth section of this act, which professes to reserve to the states the powers given in the former act, as well as the language of the repealing clause, in the saving which it contains as to offences; still confines all their provisions to the case of illegal importation; thus leaving the seventh section in force, but without any express power to dispose of the coloured persons, otherwise than to appoint some one to receive them.

And so likewise the seventh section of the act of 1818, which professes to confirm sales previously or subsequently made under the state laws, confines its provisions to sales made under condemnation for illegal importation; thus not comprising the cases of condemnation under the seventh section of the act of 1807, at least so far as relates to this offence.

The final condemnation in this court took place March 13th, 1820; but previous to that time was passed the act of March 3d, 1819, entitled, an act in addition to an act, prohibiting the slave trade; by which a new arrangement is made as to the disposal of persons of colour seized and brought in under any of the acts prohibiting the traffic in slaves. By the latter act, they are deliverable to the orders of the president; not of the states. And the repealing clause repeals all acts and parts of acts which may be repugnant to this act. So that if in the disposal of persons of colour brought into the United States, the provisions of this act embrace the case of such persons when brought in under the seventh section of the act of 1807, the power to deliver them to the order of the states was taken away before the final decree in this court.

Such, in the opinion of the court, is the effect of the act of 1819. And then the question is, how does it affect the present controversy.

Ever since the case of Yeaton *vs.* The United States, 5 Cranch, 286, the court has uniformly acted under the rule established in that case; to wit, that in admiralty causes a decree was not final while it was depending here. And any

[United States *vs.* Preston.]

statute which governs the case, must be an existing, valid statute, at the time of affirming the decree below.

Whatever was the extent of the legal power of the state, over the Africans, it is clear that such power could not be exercised finally over them at any time previous to the final decree of this court; we must therefore consider, whether, if they had been specifically before the court at the date of that decree, they must have been delivered up to the state, or the United States: clearly to the United States. And then this claim of the state cannot be sustained. We would not be understood to intimate, that the United States are entitled to this money; for they had no power to sell. Nor do we feel ourselves bound to remove the difficulties which grow out of this state of things.

With regard to the ground of irregularity: if not abandoned by the attorney general, it was but slightly touched upon, and we know of no other mode in the existing state of things, in which the rights of the parties could be reached, according to the course of the admiralty, but that here pursued.

On the question whether the decision in the second cause, in which the subject of this seizure was before us, was not final as to the rights of the United States, we are clearly of opinion, that it was not, as against this party. Although this question might then have been raised by the state, and could as well then have been settled; yet it was not raised, nor was it the interest of any of the parties then before the court, that it should be raised.

The decree below must be reversed.


This cause came on to be heard on the transcript of the record from the circuit court of the United States for the eastern district of Louisiana, and was argued by counsel; on consideration whereof, it is ordered, and decreed by this court, that the decree of the said district court in this cause be, and the same is hereby reversed, and that the said cause be, and the same is hereby remanded for further proceedings to be had therein according to law and justice, and in conformity to the opinion of this court.