DUKE<br>*v.*<br>ROUTH.

---

## ISABELLA *v.* PECOT.

An appeal will be dismissed only where the appellee shows himself clearly entitled to that relief. In case of doubt, the interpretation will be liberal in favor of the appellant.

Where an appeal is granted on motion, in open court, no citation is necessary.

An irregularity in the mode of bringing up an appeal, not mentioned among the grounds set forth in a motion to dismiss, will not be noticed.

It is a general principle of evidence that, the best evidence must be produced which the nature of the case admits of.

Where a witness is introduced by a party to prove the law of a foreign country, the opposite party may require that he shall be first asked, whether the law, as to which he is about to testify, is written or unwritten. If he answers that the law is unwritten, his testimony will be admissible to prove what it is; if written, an authenticated copy of the law, or at least a copy proved to be a true copy by a witness who has examined and compared it with the original, can alone be received.

State courts have no jurisdiction of an action for freedom, instituted by one held as a slave against a person by whom it is alleged that she was illegally brought into the State from a foreign country, or against those holding under such a person. The courts of the United States have exclusive jurisdiction to ascertain and punish the offence of such an illegal importation; and, if the offence be established, the person imported must remain in the custody of the marshal, subject to the orders of the President of the United States. Acts of Congress of 20 April, 1818, and 3 March, 1819, s.3. The laws of this State do not consider that the freedom of the slave can be acquired by such an illegal importation.

APPEAL from the District Court of St. Mary, *Boyce*, J. The petitioner alleges that she is a woman of color, and was brought into the State of Louisiana, about the first of March, 1836, by one *Thomas Gates*, from Mexico, where she was held as a slave by *Gates*; that, after she was brought into this State, she was held as a slave, and seized and sold to pay the debts of *Gates*, and was purchased by *Milton Johnson*, in 1840, and that at the sale of the estate of the latter she was purchased by *William C. Dwight*, who not paying for her, she was seized and sold at public auction, in October, 1842, to *Pecot*; that *Pecot*, when he purchased her, was informed that she claimed her freedom, as she had been brought into Louisiana, from Texas; that since said sale, *Pecot* has held your petitioner in bondage, as a slave; that by the constitution and laws of Mexico, slavery is not tolerated, but is prohibited; and that she was brought into the United States in violation of the constitution and laws thereof, and that by the laws of the United States no one can hold her in slavery. Wherefore, she prays that she may be permitted to sue for her freedom; that she may be taken into the possession of the sheriff of St. Mary; and that she may be declared free.

*Pecot*, the defendant, filled a general denial, but admitted that he bought the slave as alleged, and avers that he is her *bonâ fide* owner, &c. He cited *Carson*, administrator of *Johnson's* estate, and *Dwight*, in warranty. *Dwight* denied that *Pecot* had any claim against him in warranty, and answered that he purchased said slave from *Sarah Johnson*, wife of *N. Dalsheimer*, who he prays may be cited in warranty.

ISABELLA
*v.*
PECOT.

*Sarah Johnson* and her husband filed a general denial, and specially denied any warranty, as *Dwight* placed himself in lieu and stead of the respondents, and was subrogated to the right of *Sarah Johnson* against *Milton Johnson's* estate, &c. They further alleged, that they purchased the slave from the estate of *Milton Johnson*, and that *Carson*, administrator of his estate, is bound in warranty, who they pray may be cited. *John Carson* filed a general denial, &c.

Before the trial, the warrantors filed an exception to the jurisdiction of the court, on the ground that the Circuit or District Court of the United States had exclusively the right to pronounce upon the charge of illegally importing the slave, which was overruled by the court, and a bill of exceptions taken.

On the trial a witness was offered to prove that slavery was prohibited by the laws of Mexico in 1835 and 1836, who was objected to on the ground that plaintiff had not previously shown that there was no statute or written law in Mexico on the subject, which he was bound to do, before being allowed to prove the laws of that country by parol. The objection was sustained. There was a judgment below for the defendant, and the plaintiff has appealed.

*Dwight*, for the appellant. The laws of foreign States may be proved by parol, unless it appear that they are statutory or written. 5 Mart. 673. 2 La. 154. 17 La. 514, 595. 5 Rob. 163. In suits for freedom every thing should be done *in favorem libertatis*, which can properly be done, even to noticing facts *dehors* the record. 8 La. 479. 9 La. 373. The court should notice officially the well known fact that, slavery is not tolerated in Mexico. Would it be required of a party to prove the french or english governments to be monarchies, or that Paris is the capital of France, or London of Great Britain ? Why then not notice the equally well know fact, that slavery is is not tolerated in England, France, or Mexico ? This court has twice, *in favorem libertatis*, noticed the fact of its not being tolerated in France. See 9 La. 373. *Eugenie* v. *Preval*, lately decided, *ante* p. 180. One who has been once free, cannot become a slave. 8 Mart. N. S, 699. 9 La. 209, 476. A slave taken to a free country becomes free, and cannot be again reduced to slavery. 16 La. 483. 13 La. 442. 9 La. 473. 11 La. 499. 2 Mart. N. S, 401, A negro purchased in a country where slavery is not tolerated, will be presumed to be free. 4 Mart. 385. A negro or colored person, brought here from a foreign country, cannot be held in bondage. Stat. 20 April, 1818, ss. 5. 6, 7, 8. 3 Story's Laws U. S. 1699, 1700. Stat. 3 March, 1819, s. 4. 3 Story's Laws, U. S. 1753. 11 La. 602. 8 La. 479.

*Splane*, for the defendant.

*Maskell, Simon* and *Morphy*, for the warrantors. The exception should be sustained. The forfeiture of a slave imported, or claimed, in violation of the laws of Congress in relation to the slave trade, must be the result of a suit or judical proceeding before the United States District Courts, which, under the 9th section of the judiciary act of the 24th of September, 1789, have exclusive jurisdiction of all suits for penalties and forfeitures incurred under the laws of the United States. See Ingersoll's Dig. Vo. Courts, sec. 8. By the provisions of the act of the 20th of April, 1818, the prohibitions of which have been held to extend to carrying slaves from one country to another (9 Cranch, 403, 404); and by those of the act of the 3d of March, 1819 (Ingersoll's Dig. Vo. Slave Trade), the importation of a slave into the United States, from any foreign country, is made an offence against the laws of the general government, subject to be punished by fine and imprisonment, and forfeiture, as the case may be, and in all cases, by the forfeiture of the slave so imported, who was, by the act of 1818, to remain subject to any regulations which the legislatures of the different States might at any time theretofore have made, or hereafter make, for disposing of any such slave (sections 5 and 7), but who, by the act of 1819 (sections 2 and 4), is to remain subject to the order of the President of the United States, for the purposes provided for in the second section of said act.

The allegations of the petition are, that plaintiff was brought into the United States in violation of the constitution and laws thereof, and that, under those laws, no one can hold her in slavery ; and the position taken by the warrantors,

under their exception, is, that a District Court of the United States has exclusive jurisdiction of this suit under the allegations, the object of which is to maintain and show that said plaintiff has been illegally imported, and that her owners have incurred, not only the penalties and forfeitures imposed by the laws of Congress, but also the forfeiture of their slave.   The State courts have no jurisdiction to try such matters.   There must be a conviction on the issue of the illegal importation, before pronouncing the forfeiture of the slave, and such conviction cannot be had but before a court of the United States, whose jurisdiction extends exclusively over all suits for penalties and forfeitures incurred under the laws of the United States.

Plaintiff having offered a witness to prove that slavery was prohibited by the laws of Mexico in 1835 and 1836, defendant's counsel objected, on the ground that plaintiff had not previously shown that there was no statute or written law prohibiting slavery in Mexico, which he was bound to do before he could prove the laws of that country by parol.   It is well known that Mexico, formerly under the Spanish dominion, and governed by the laws of Spain, under which slavery was authorised and tolerated, continues to be governed by those laws, except so far as it was found necessary to change or abrogate them after the declation of her independence.   Mexico never was governed by common or unwritten laws, and having adopted the form of representative government, the former laws could not be changed or abrogated but by statute, or by the provisions of her constitution.   This being premised, as belonging to the general history of that country, how could the plaintiff be allowed to prove by parol, a law, which, if it existed at all, must be written ?   The proof of a law of Mexico by parol, would not be the best evidence.   The testimony offered pre-supposes better testimony attainable, and the judge decided correctly in rejecting it.   Story, Conflict of Laws, nos. 638, 639, &c.   2 Cranch, 237.   17 La. 513.   3 Rob. 8.

The slave *Isabella* was not brought into the United States, in contravention of the law.   Her owner was a citizen of Texas, which at that time (1836) had revolted from Mexico, and was invaded by an armed force from Mexico with a view to bring it again under the power of the Mexican government. During that invasion, the master fled with his slave into the United States for protection.   Can it be said that, in such a case, there was any attempt to violate the laws of the United States ?   The plaintiff, under the very laws which she invokes, has no right to sue for her freedom.   Supposing that she was imported into this country in violation of those laws, the only consequence of such illegal importation, with regard to herself, after conviction before a court of competent jurisdiction, would be, that she would remain subject to being disposed of according to the laws or regulations adopted by the legislature of Louisiana, or to being taken possession of and kept in the custody of the marshal, subject to the order of the President.

The law of Congress of the 20th April, 1818, gives the right to the legislatures of the different States to adopt regulations for disposing of any slave illegally imported, and contemplates that such slave may be sold in virtue of such regulations.   Sections 5 and 7.   It appears that the legislature of this State, by a law passed on the 13th of April, 1818 (B. and C,'s Dig. p. 789), had already provided for disposing of the slaves imported into the United States, in violation of the law of 1807, by a sale thereof.   The preamble of that act shows the object of the regulations, adopted on this subject by our legislature. in conformity with the law of Congress.   The act does not contemplate that the slave shall be free, but, on the contrary, the 2d section provides, that "the decree of the Circuit or District Court of the United States for the Louisiana District, properly certified and authenticated, condemning, &c., shall be taken and considered by the sheriff, for the time being, as a sufficient warrant, to sell or cause to be sold as a slave for life, any negro, &c."   The 1st section had provided that the sheriff should be required to receive any negro, &c., and keep him until the Court of the United States pronounced a decree upon the charge of illegal importation.   Another law was passed by Congress in 1819, providing that any slave illegally imported should remain subject to the order of the President of the United States, for the purposes provided for in the 2d section of the act, which authorised him to make such regulations and arrangements as he might deem expedient, for the safe-keeping, support and removal beyond the limits of the United States; and the previous laws on this subject were perhaps repealed

ISABELLA
v.
PECOT.

by the law of 1819.  But is there any thing in any of those laws which gives to the slave the right of suing for freedom, and of acquiring emancipation, from the fact of having been illegally imported ?  There must be a decree of the Court of the United States ; there must be a conviction, before the owner or purchaser of the slave can be deprived of his property ; and even then the slave does not become free ; he is to be sold as a slave for life under the laws of our State, or to be taken possession of and kept by the marshal, to be removed beyond the limits of the United States, under the regulations and arrangements adopted by the President.

The judgment of the court was pronounced by

SLIDELL, J.  There is a motion to dismiss this appeal, upon two grounds. One is, that the transcript has been returned directly to this court, though by the order of appeal, made in 1845, it was returnable to Opelousas.  The appellant has manifested suitable diligence .to comply with the order granting him time, made at the last Opelousas term, and the failure to do so is entirely attributable to the fault of the clerk of the court below.  Under the peculiar circumstances of this case, we think, the direct filing at New Orleans was authorited by the statute of 1846 ; at least, under that statute, which, in some of its provisions upon a new and difficult subject is not free from obscurity, the point is not clearly against the appellant.  We adopted, in the recent case of *Gilmore* v. *Brenham,* 1 An. R. 414, a rule which we believe a salutary one, that motions for dismissal will not be sustained, unless there be a clear case for dismissal.  We stated then the reasons why the appellant would be considered as entitled to the benefit of any doubt, and it is not necessary to reiterate them.

Another ground of the appellee's motion for dismissal is, that the warrantors have not been cited.  The appeal was granted on motion made in open court, and no citation was necessary.  Whether there be any defect in the appeal bond, is a question not necessary to be considered ; for the objection is not made in the grounds of the motion, which present the mere question of citation.  The warrantors have left this motion for dismissal on the grounds presented by the defendant.  We shall therefore proceed to the consideration of the cause, on its merits.

The petitioner alleges that, in 1836, she resided in Mexico, in the province or State of Texas, where she had resided for some years previously ; that she was held to service as a slave in said country, by a man named *Thomas Gates :* that, in 1836, she was brought by the said *Gates* across the Sabine river into the United States, and that the said *Gates*, with his family and the petitioner, soon after removed to the parish of St. Mary ; that *Gates*, claiming her as a slave, held her to service in the parish where she was afterwards seized and sold to pay the debts of *Gates.*  The mesne conveyances are then recited, by which she was eventually conveyed to the defendant *Pecot*, against whom she claims her freedom.

The plaintiff rests her claim to freedom on two grounds : that she was never lawfully held to slavery in Texas, because by the laws of Mexico slavery was not tolerated, but prohibited ; and that, if lawfully held as a slave in Texas, her importation into the United States from Texas, a foreign country in 1836, was in violation of the laws of the United States, and that *Gates* thereby forfeited any right of ownership which he may have theretofore had.  At the trial of the cause the plaintiff offered to prove by the testimony of a witness that, at the time when *Gates* held the plaintiff in slavery in Texas, slavery was prohibited by the laws of Mexico.  The defendant objected to this testimony: " Upon the

ground that plaintiff had not first shown that there was no statute law prohibiting slavery in Mexico or no written law, which he was bound to do before he could prove the laws of Mexico by parol. And the said objection being sustained by the court, which refused to permit said parol proof by said witness and permit said question to be answered to this effect, unless it was first shown that there was no written law, the plaintiff excepts to said opinion of the court, &c."

We think the court did not err. The general principle is, that the best testimony or proof shall be required, which the nature of the case admits of. The requisition of the court, upon the objection of the opposite party, in effect was, that the witness called to prove the laws of the foreign country, should be first asked whether the law as to which he was about to testify, was a written or an unwritten law. There was no hardship in this, and its tendency was to save the time of the court by preventing the introduction of illegal testimony. If the course of examination prescribed by the court had been adopted, and the witness had declared that the law he was called to prove was an unwritten law, we must suppose the examination would have been permitted by the judge to proceed, and that the proof would have been sufficient, for courts should only require proof of foreign laws by such species of testimony as the institutions and usages of the foreign country admit of. If the foreign law be unwritten, no other testimony than that of witnesses is attainable, and it would be unreasonable and vain to require any other. But if the foreign law be a written law, then higher evidence should be produced, in the form of an authenticated copy, or at least of a copy proved to be a true copy by a witness who has examined and compared it with the original. See *Church* v. *Hubbard*, 2 Cranch, 237. Story's Conflict of Laws, ss. 639, 640. Greenleaf on Evidence, ss. 487, 488.

The ruling of the court derives, if need be, additional force from the acts of the plaintiff. On a previous calling for trial, the plaintiff had applied for a continuance, on affidavit, for the purpose of "procuring from the city of Mexico a copy, duly authenticated, of the law of the Republic of Mexico forbidding and abolishing slavery in the Republic." Besides, we know that, by the laws of Spain, of which Mexico, like Louisiana, was once a province, and which laws once governed our territory, slavery was recognized. If that law has been changed since Mexico passed from the dominion of Spain, it could scarcely have been otherwise than by written law.

The plaintiff has herself offered testimony very unfavorable to her case. Her principal witness declares that, before the plaintiff was brought from Texas, he had seen many persons held as slaves there, and that the cotton plantations there were cultivated by slave labor. It is also a matter of public history with regard to this member of our confederacy, that Texas formally announced her independence before the date at which the plaintiff proves that she was brought from Texas into Louisiana, and that the condition of slavery was recognized in that State before its admission into the Union.

Being of opinion that the plaintiff has failed to establish that she had been unlawfully held to slavery in Texas, it remains to consider the effect of her importation into the United States from Texas, then a foreign country.

In the year 1836, when a hostile army had entered the territory of Texas to renew the attempts, which had so often proved abortive, to reduce the people of that country to subjection, a portion of the population fled for refuge to the Sabine, seeking safety for their lives and property within the confines of the

ISABELLA
v.
PECOT.

United States. It may well be questioned, whether an importation of a slave, under such circumstances, could be deemed a violation of our laws concerning the slave trade. Our federal government, in its diplomatic discussions with foreign powers, has certainly asserted, on occasions not dissimilar, a very different doctrine, where the rights of her own citizens in slave property were jeoparded, when brought by uncontrollable misfortune within the foreign territory.

This consideration is not, however, indispensable to the present enquiry. If the laws of the United States would affect the rights of the owner of a slave imported under such circumstances, can the commission of the offence be enquired into by a State tribunal, at the suit of the slave against the party alleged to have committed the unlawful act, or those holding under him. We think not. The jurisdiction of the United States Court should be invoked to adjudge and punish the offence, and the person so imported, in case the verdict of a jury should ascertain the commission of the offence, would remain in the custody of the marshal for safe-keeping, subject to the orders of the President of the United States. Under the former legislation, slaves unlawfully imported were to remain subject to such regulations as the State legislature might establish, and the statute of Louisiana provided that such slaves should be sold by the sheriff as slaves for life. In 1819, the power thus given to the State legislatures was taken away, and it was enacted that the slave should remain in the custody of the marshal, as above stated. There is nothing in our State legislation which recognises the freedom of the slave as acquired by the illegal importation, and the legislation of Congress must be interpreted as a whole, and administered and executed as Congress has directed. See *United States* v. *Preston*, 3 Peters, 66. Acts of Congress, of April 20, 1818, and 3 March, 1819, sec. 3, &c. Statute of Louisiana, 13 April, 1818.  *Judgment affirmed.*