87 U.S. 92
 22 L.Ed. 320
 20 Wall. 92
 THE CONFISCATION CASES.
SLIDELL'S LAND.
 October Term, 1873
 
 1
 ERROR to the Circuit Court for the District of Louisiana; the case being thus:
 
 
 2
 On the 17th of July, 1862, Congress passed an act entitled 'An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.'[1]
 
 
 3
 The act contains fourteen sections. The first prescribes the punishment for treason; punishing it with death, or, in the discretion of the court, with imprisonment and fine, and liberating the offender's slaves.
 
 
 4
 The second provides for the punishment of the offence of inciting, setting on foot, or engaging in any rebellion or insurrection against the authority of the United States or the laws thereof, or engaging in or giving aid and comfort to the rebellion then existing.
 
 
 5
 The third declares that parties guilty of either of the offences thus described, shall be forever incapable and disqualified to hold any office under the United States.
 
 
 6
 The fourth provides that the act shall not affect the prosecution, conviction, or punishment of persons guilty of treason before the passage of the act, unless such persons are convicted under the act itself.
 
 The fifth section enacts:
 
 7
 'That to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States, that is to say:
 
 
 8
 'First. Of any person hereafter acting as an officer of the army or navy of the rebels, in arms against the government of the United States.
 
 
 9
 'Secondly. Of any person hereafter acting as President, Vice-President, member of Congress, judge of any court, cabinet officer, foreign minister, commissioner, or consul of the so-called Confederate States of America.
 
 
 10
 'Thirdly. Of any person acting as governor of a State, member of a convention or legislature, or judge of any court of any of the so-called Confederate States of America.
 
 
 11
 'Fourthly. Of any person who having held an office of honor, trust, or profit in the United States, shall hereafter hold an office in the so-called Confederate States of America.
 
 
 12
 'Fifthly. Of any person hereafter holding any office or agency under the government of the so-called Confederate States of America, or under any of the several States of the said Confederacy, or the laws thereof, whether such office or agency be national, State, or municipal in its name or character: Provided, That the persons, thirdly, fourthly, and fifthly, above described, shall have accepted their appointment or election since the date of the pretended ordinance of secession of the State, or shall have taken an oath of allegiance to, or to support the constitution of the so-called Confederate States.
 
 
 13
 'Sixthly. Of any person who, owning property in any loyal State or Territory of the United States, or in the District of Columbia, shall hereafter assist and give aid and comfort to such rebellion; and all sales, transfers, or conveyances of any such property, shall be null and void; and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section.'
 
 
 14
 The sixth section makes it the duty of the President to seize and use as aforesaid all the estate, property, moneys, stocks, and credits of persons within any State or Territory of the United States, other than those named in the fifth section, who, being engaged in armed rebellion, or aiding and abetting the same, shall not, within sixty days after public warning and proclamation duly made by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to their allegiance to the United States.
 
 The seventh section provides:
 
 15
 'That to secure the condemnation and sale of any of such property, after the same shall have been seized, so that it may be made available for the purpose aforesaid, proceedings in rem shall be instituted in the name of the United States in any District Court thereof, or in any Territorial court, or in the United States District Court for the District of Columbia, within which the property above described, or any part thereof, may be found, or into which the same, if movable, may first be brought, which proceedings shall conform, as nearly as may be, to proceedings in admiralty or revenue cases, and if said property, whether real or personal, shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto, the same shall be condemned as enemy's property, and become the property of the United States, and may be, disposed of as the court shall decree, and the proceeds thereof paid into the treasury of the United States, for the purposes aforesaid.'
 
 
 16
 The eighth section authorizes the said courts to make such orders, and establish such forms of decrees of sale, and direct such deeds and conveyances to be executed, where real estate shall be the subject of sale, as shall fitly and efficiently effect the purposes of the act, and vest in the purchasers of the property good and valid titles.
 
 
 17
 The thirteenth section authorizes the President, at any time thereafter, by proclamation, to extend to persons who may have participated in the existing rebellion, pardon and amnesty, with such exceptions, and at such time and on such conditions, as he may deem expedient.
 
 
 18
 The fourteenth section gives the courts aforesaid full power to institute proceedings, make orders and decrees, issue process, and do all other things to carry the act into effect.
 
 
 19
 In pursuance of this act, the United States, on the 15th of September, 1863, filed what it entitled a 'libel' of information, but what in form and substance was an information, in the District Court of the United States for the District of Louisiana, for the condemnation and forfeiture of certain real property, to wit, eight hundred and forty-four lots and ten squares of ground in New Orleans, all described in the information. One of the averments of the information was that the lots and squares had, on the 15th of August, 1863, been seized by the marshal, in compliance with written instructions issued by the Attorney-General of the United States to the district attorney thereof, by virtue of the act of Congress of July, 1862, the act above quoted, and that they belonged to John Slidell. It was not, however, said in terms that the seizure was made by order of the President of the United States. Other averments were the following:
 
 
 20
 '5th. That the said John Slidell, subsequently to said 17th day of July, in the year of our Lord 1862, did act as an officer of the army or navy of the rebels in arms against the government of the United States, OR as a member of Congress, OR as a judge of a court, OR as a cabinet officer, OR as a foreign minister, OR as a commissioner, OR as a consul of the so-called Confederate States of America; OR that while owning property in a loyal State or Territory of the United States, or the District of Columbia, he did give aid and comfort to the rebellion against the United States, and did assist such rebellion.
 
 
 21
 '6th. That the said John Slidell, subsequently to said 17th day of July, in the year of our Lord 1862, did act as governor of a State, OR as a member of a convention or legislature, OR as judge of a court of one of the so-called Confederate States of America, to wit, the State of Louisiana, OR did hold an office in the so-called Confederate States of America, after having held an office of trust or profit in the United States; OR did hold an office or agency under the government of the so-called Confederate States of America, OR under one of the States thereof, said office being national, State, or municipal in its name and character, which said office or agency he accepted after the date of the pretended ordinance of secession of the State of Louisiana; that he did take an oath of allegiance to, or to support the constitution of the so-called Confederate States.
 
 
 22
 '7th. That the said John Slidell, subsequently to said 17th day of July, in the year of our Lord 1862, within a State or Territory of the United States, was engaged in armed rebellion against the government of the United States, and did not, within sixty days after public warning and proclamation duly given and made by the President of the United States, on the 25th day of July, in the year of our Lord 1862, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States.
 
 
 23
 '8th. That the said John Slidell, subsequently to said 17th day of July, in the year of our Lord 1862, within a State or Territory of the United States, was engaged in aiding and abetting an armed rebellion against the government of the United States, and did not, within sixty days after public warning and proclamation duly given and made on the 25th day of July, in the year of our Lord 1862, by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States.'
 
 
 24
 On the presentation of the libel of information the District Court directed a warrant to issue to the marshal, commanding him to seize the property described, and to cite and admonish the owner, or owners, and all other persons having, or pretending to have, any right, title, or interest in or to the same, to appear before the court on or before the third Monday from the service thereof, to show cause, if any they had, why the property should not be condemned and sold according to the prayers of the libellants.
 
 
 25
 The 'order of publication,' made September 15th, 1863,
 
 
 26
 'Ordered, That notice be given to the owner and owners of said property and real estate, and all persons interested or claiming an interest therein, to appear and answer this information on the 5th day of October, 1863, and show cause, if any they have, why said property and real estate, and the right, title, and interest therein of the said John Slidell should not be condemned and sold according to law; and that notice be given by posting a copy of this order upon the front door of the courthouse in the district, and by publication in the Era newspaper twice a week previous to said 5th day of October, A.D. 1863, the first publication to be on or before 19th instant.'
 
 
 27
 The marshal, on the 3d of October, returned:
 
 
 28
 'Received, 16th September, 1863, and on the same day, in obedience to the within order of seizure, seized and took into my possession the within described property, posted copies of the warrant, libel, and judge's order on the door of the court-house, published monition in the Era, a newspaper printed and published in New Orleans, on the 18th, 23d, 26th, 30th September, 3d October, 1863, returnable 5th October, 1863.'
 
 
 29
 The warrant, citation, and monition was signed by the deputy clerk (not by the clerk), and was attested by the signature of the judge and the seal of the court.
 
 
 30
 On the 18th of April, 1864, after due monition and proclamation, no claim or defence having been interposed, a default was entered, and the information was adjudged and taken pro confesso. Depositions were then taken and filed, and on the 18th of March, 1865, after consideration of the law and the evidence, the District Court adjudged and decreed a condemnation and forfeiture of the property to the United States; there having been, as the reader will understand without its being said, no jury trial in the case. The exact language of the decree, after its recital, was:
 
 
 31
 'That the eight hundred and forty-four lots and ten squares of ground, with all the buildings and improvements thereon, property of John Slidell, and fully described in the libel of information on file, be, and the same are hereby, condemned as forfeited to the United States.'
 
 
 32
 Subsequently, a venditioni exponas was issued, under which portions of the property were sold. The money produced, it was said at the bar, was yet in the registry.
 
 
 33
 On the 17th of March, 1870, the case was removed to the Circuit Court by writ of error, where the judgment of the District Court was reversed and the libel of information was ordered to be dismissed. The sales, however, were confirmed.
 
 That court said:
 
 34
 'The information is a remarkable specimen of loose pleading and uncertain statement. From the allegation in the fifth article no man can tell what John Slidell did. The next article is of the same ambiguous and unconsequential nature. The extreme ambiguity of the charges in it is something more than a matter of form; it amounts to a substantial defect. There is, in truth, no charge at all. There is no charge that Slidell acted as a foreign minister of the confederacy. The allegation is that he either did that or something else; but we are not informed what. If the defect were one of form it might be amended; but being substantial, it seems to me it is fatal.
 
 
 35
 'The other articles of the information do not save it. The same ambiguity is kept up in the saventh and eighth articles as in the previous ones, but they do not set forth any of the offences which in the statute are made the basis or cause of confiscation. They are evidently meant to be assigned under the sixth section of the act. But that section refers to persons who in any State or Territory of the United States, other than those named as aforesaid, were engaged in the rebellion. Now, the States named, as aforesaid, were the loyal States, which had just been named in the last clause of the fifth section. Therefore, the States or Territories, other than those, were the disloyal States or rebellious States. So that the sixth section of the act only refers to persons who within any disloyal or rebellious States or Territory were engaged in the rebellion.
 
 
 36
 'Yet the seventh article of the information merely alleges that Slidell, within a State or Territory of the United States, was engaged in rebellion. It does not make a charge within the statute.
 
 
 37
 'The whole information, therefore, is substantially defective, and the judgment must be reversed.'
 
 
 38
 From this action of the Circuit Court the case was brought here.
 
 
 39
 It is proper here to refer to certain proclamations relied on in support of the decree of that court.
 
 
 40
 On the 4th of July, 1868, the President, in pursuance of authority given to him by Congress, issued his proclamation.[2] After preamble reciting the then condition of things, it said:
 
 
 41
 'And whereas it is believed that amnesty and pardon will tend to secure a complete and universal establishment and prevalence of municipal law and order in conformity with the Constitution of the United States, and to remove all appearances or presumptions of a retaliatory or vindictive policy on the part of the government, attended by unnecessary disqualifications, pains, penalties, confiscations, and disfranchisements, and on the contrary to promote and procure complete fraternal reconciliation among the whole people, with due submission to the Constitution and laws.
 
 
 42
 'Now, therefore, I hereby proclaim and declare unconditionally and without reservation to all and to every person who directly or indirectly participated in the late insurrection or rebellion, except such person or persons as may be under presentment or indictment in any court of the United States having competent jurisdiction, upon a charge of treason or other felony, a full pardon and amnesty for the offence of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights of property except as to slaves, and except also as to any property of which any person may have been legally divested under the laws of the United States.'
 
 
 43
 On the 25th of December, 1868, another proclamation was made, relinquishing all previous reservations and exceptions, proclaiming and declaring unconditionally and without reservation to all and every person who directly or indirectly participated in the late insurrection or rebeellion a full pardon and amnesty for the offence of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof.
 
 
 44
 
 Mr. Thomas Allen Clarke, against the decree of confiscation:
 
 
 
 45
 1. The District Court was without jurisdiction. The jurisdiction established by the Confiscation Act is special. It does not enlarge the admiralty and revenue jurisdiction. It only refers to the mode of procedure therein as that to be observed. A limited jurisdiction is given to this court. It had no such jurisdiction before. Its powers in this regard are the same as and no greater than such powers would be if a new court had been created to exercise the jurisdiction.
 
 
 46
 2. No property is within the seventh section unless it have been seized previously to the filing of the information. There is nothing like such a seizure in this case.
 
 
 47
 Further. Such previous seizure must be made by order of the President of the United States. The libel avers that the district attorney, as directed by the Attorney-General, caused the seizure. This not tantamount to an order from the President. The averment should have been that the President had caused the seizure, and this could have been established by proof of seizure through the intermediate directions. The authority of seizure is intrusted to the President. He alone can exercise that authority. His will must be manifested. This court has repeatedly determined that the authority is derived from the war powers which Congress possesses, and has intrusted to him.
 
 
 48
 In The Sea Lion,[3] Congress authorized the President to license certain traffic with the enemy. The various officers, army, navy, and treasury, sanctioned the trade, but the court determined that their acts were not and could not be within the warrant of the act of Congress. 'The President only could grant such a license.' The action of his subordinates was not presumable as by his authority. Neither in the duties or authority of the Attorney-General is there any such relation to the President as would authorize him to act as the organ of the President in reference to seizures. On the contrary, it is inferable from the fact that the seizure is a war seizure, that the officers charged with the subordinate executive power in matters of war would be the persons charged with the seizure, rather than a peace officer.
 
 
 49
 3. The proceedings were on the admiralty instead of the common-law side of the court. The proceedings commenced by a libel of information, not by an information. The warrant and citation is called a monition. The witnesses were examined out of court; and, greatest of all, the case was tried by the judge without the presence of a jury. This sort of mistake is one which has been made many times under the Confiscation Act, both in Louisiana[4] and elsewhere.[5] But wherever made it has been fatal; as the cases to which we refer in illustration of the fact, themselves show.
 
 
 50
 4. There was no service of process. The District Court ordered 'that notice be given by posting a copy of this order upon the front door of the court-house in this district, and by publication in the Era newspaper, twice a week previous to said 5th day of October, A.D. 1863, the first publication before 19th instant.' All the service made of this order was by posting copies of the order on the door of the court-house. This was no service or substituted service.
 
 
 51
 5. The libel of information was informal. It contained no charge against Slidell. We iterate and invoke to our benefit as unanswerable in this matter what is said by the Circuit Court. The law has long been settled, from the time of Sergeant Hawkins, and before, that charges in the disjunctive are erroneous, and do not authorize judgment on either.[6]
 
 
 52
 Still further. The twenty-second admiralty rule ordains that
 
 
 53
 'All informations and libels of information upon seizures for breach of the revenue, navigation, or other laws of the United States, . . . shall aver the same to be contrary to the form of the statute or statutes of the United States in such case provided.'
 
 
 54
 The absence of this averment has, upon error, been determined to be fatal both in indictments and informations.[7]
 
 
 55
 6. The warrant, citation, and monition were not signed by the clerk of the court, who alone was the proper person to sign them.
 
 
 56
 7. There is no finding that the property was Slidell's, nor the property of any one liable to the penalty of the Confiscation Act.
 
 
 57
 Notwithstanding the default, it was the duty of the court to 'proceed to hear and determine the case according to law, as is directed by the 89th section of the act of March 2d, 1799,[8] respecting forfeitures incurred under that act.'
 
 
 58
 The rule in existence at the time of the passage must be regarded as embraced in effect in the statute of 1862.
 
 
 59
 8. The proclamations of 1868 effect a repeal of the Confiscation Act. They restore all rights of property. Proceedings hostile to any of the parties engaged in the late civil war would be in violation of the spirit and letter of the proclamations. The war has ceased. Further action 'to insure the speedy termination of the (then) present rebellion,' is not required. The army is no longer arrayed upon a war footing, and the proceeds of property of the offenders is no longer needed for such a use.
 
 
 60
 The cases of Yeaton v. The United States,[9] and United States v. Preston,[10] determine that the repeal of the law pending an appeal leaves nothing to operate upon, and that the decree must be reversed.
 
 
 61
 In this case the money produced by the sales is in the registry.
 
 
 62
 Mr. C. H. Hill, Assistant Attorney-General, contra.
 
 
 63
 Mr. Justice STRONG delivered the opinion of the court.
 
 
 64
 The Circuit Court was of opinion that the information was insufficient; that it did not aver distinctly and separately what John Slidell had done; that it, in fact, made no charge at all against him, and, therefore, that it was substantially defective. In this opinion we cannot concur. As was said in Miller v. The United States,[11] the proceedings directed by the fifth, sixth, and seventh sections of the Confiscation Act are proceedings in rem, and they are required to conform, as nearly as may be, to proceedings in admiralty or revenue cases. They are in no sense criminal proceedings, and they are not governed by the rules that prevail in respect to indictments or criminal informations. It may be conceded that an indictment or a criminal information which charges the person accused, in the disjunctive, with being guilty of one or of another of several offences, would be destitute of the necessary certainty, and would be wholly insufficient. It would be so for two reasons. It would not give the accused definite notice of the offence charged, and thus enable him to defend himself, and neither a conviction nor an acquittal could be pleaded in bar to a subsequent prosecution for one of the several offences. But in proceedings against real or personal property to obtain a decree of condemnation and forfeiture under the Confiscation Act, liability of the property seized to confiscation is alone the subject of inquiry. No judgment is possible against any person. The enactment of Congress was that property belonging to any one embraced within several classes of persons should be subject to seizure and condemnation. Persons were referred to only to identify the property. Not all enemies' property was made confiscable; only such as was designated by the act, and reference to the ownership was the mode selected for designating that which was made liable to confiscation. If the property belonged to a person who had filled either of the offices specified, or who had done any of the acts mentioned in the fifth, sixth, or seventh articles of the information, it was the property which the act had in view. The United States had, therefore, only to aver and prove that the lots and squares seized belonged to some one who was one or another of the persons referred to in the fifth or sixth sections of the act of Congress. In either alternative the property was made subject to confiscation. It may be the information might have been more artifically drawn, and that if the owner had appeared in answer to the citation he might have interposed successfully a special demurrer. But after default was made and entered, and after a final judgment of condemnation, faults in the mode of pleading, mere formal faults, can be of no importance. They cannot have injured any one. If the information set forth, though informally, a substantial right of action, it was sufficient, and the judgment cannot be disturbed because of such faults. And that it did in this particular cannot be questioned, for if the ownership of the property was in a person embraced in either class mentioned in the fifth and sixth sections of the act (no matter which class), it was liable to confiscation. This the information averred. It pursued the words of the law, and that in an admiralty or a revenue case is all that is required. In the case of The Emily and the Caroline,[12] which was a case where the libel described the offence in the alternative, pursuing the words of the law, alleging that the vessel was fitted out within a port of the United States, or caused to be sailed from a port within the United States, for the purpose of carrying on trade or traffic in slaves, the same objection was raised which has been raised in this case, namely, that the charge was in the alternative. But it was overruled. The court admitted that fitting out and causing to sail were distinct offences, but denied that charging them in the alternative was exceptionable. It was said that in 'admiralty proceedings a libel in the nature of an information does not require all the formality and technical precision of an indictment at common law. If the allegations are such as plainly and distinctly to mark the offence, it is all that is necessary. And where it is founded upon a statute, it is sufficient if it pursues the words of the law.' Reference was then made with, approbation to a note of Judge Story, in the beginning of 7th Cranch, to the case of The Caroline,[13] in which it was said the court did not mean to decide that stating the charge in the alternative would not have been sufficient if each alternative had constituted an offence for which the vessel would have been forfeited. The court then added these observations: 'It is said this mode of alleging two separate and distinct offences leaves it wholly uncertain to which of the accusations the defence is to be directed. This objection, if entitled to consideration, would apply equally to an information laying each offence in a separate count,' and they concluded that the objection, if available at all, must go to the full length of limiting every information to a single offence, which they thought was not required by any principle of justice or sanctioned by any rule of practice applicable to admiralty proceedings. The same doctrine was asserted by Chief Justice Marshall in Jacob v. The United States.[14] So in Parsons on Shipping and Admiralty,[15] the author, in view of the authorities, gives his opinion that a libellant may state his case in the alternative. So in Cross v. The United States,[16] Judge Story remarked that 'in proceedings in admiralty the same strictness is not required as in proceedings in common-law courts. And where the seizure is on land,' said he, 'although the proceedings would seem to be analogous to informations in the Exchequer, yet I do not know that in our courts the rigid principles of the common law applicable to such informations have been solemnly recognized.' These considerations, in our opinion, justify us in ruling that the Circuit Court erred in deciding that the information is fatally defective because it does not aver distinctly and separately what John Slidell had done, but makes its allegations in the alternative.
 
 
 65
 No other reason than this we have mentioned, and which we regard as insufficient, was assigned by the Circuit Court for reversing the decree of confiscation, and ordering the information to be dismissed. But during the argument in this court, other objections have been urged against the decree, which, if they are valid, would justify its reversal, though some of them would not warrant the dismissal of the libel. It, therefore, becomes necessary to examine and determine whether they exhibit error in the action of the District Court.
 
 
 66
 The first of these objections, and the one most pressed, is, that the court was without jurisdiction of the case. It is said no other property than such as had, prior to the filing of the information, been seized by the direction of the President of the United States, was within the purview of the seventh section of the Confiscation Act, and, therefore, within the limited jurisdiction of the District Court; and it is insisted the record does not show there had been any executive seizure of the eight hundred and forty-four lots and ten squares of ground before the information was filed, or, indeed, at any time.
 
 
 67
 Undoubtedly, though not an inferior court, the District Court is one of limited jurisdiction, and that it has jurisdiction of the particular case which it attempts to adjudicate, must always appear. Undoubtedly, also, only such property as has been seized by executive order is within the power of that court for confiscation proceedings. Thus much is conceded. But it is a mistaken assertion that the record in this case does not show an executive seizure of the property condemned before the District Court assumed any jurisdiction over it. The information avers that such a seizure was made on the 15th of August, 1863, by the marshal, under written authority given him by the district attorney, in compliance with instructions issued to him by the Attorney-General of the United States, by virtue of the act of Congress of July 17th, 1862 (the Confiscation Act); and to a citation or monition founded on the information, default was made. What the effect of this default was we do not propose now to discuss at length. We have gone over the ground recently in the case of Miller v. The United States,[17] and to that case we refer. In view of what was there said and decided, and in view of the authorities cited, it must be held that the default established the truth of all the material averments in the information, and among others, that there had been an executive seizure before the information was filed. It was equivalent in effect to a confession. Now, while it is true a party cannot, by consent, confer jurisdiction where none would exist without it, it is equally true that when jurisdiction depends upon the existence of a fact, its existence may be shown as well by the confession of a party as by any other evidence.
 
 
 68
 It is next contended that the court had no jurisdiction, even if the seizure alleged in the information was made, because it is not averred to have been made by order of the President of the United States. As we have seen, the libel sets forth a seizure made by the marshal, under authority given by the district attorney, in pursuance of instructions issued by the Attorney-General of the United States, by virtue of the act of Congress (viz., the Confiscation Act). It is said this exhibits no authority given by the President for the seizure, and that the Attorney-General was not empowered to direct it. But if the seizure was made by virtue of the act of Congress, as the information avers it was, it was necessarily essarily caused to be made by the President, for he only was empowered by the act to cause it. Then the Attorney-General must have been the agent of the President to give instructions to the district attorney, and through him to the marshal. The language of the statute is, 'it shall be the duty of the President to cause the seizure,' &c. This implies that the seizure is to be made by the agents of the President. And a direction given by the Attorney-General to seize property liable to confiscation under the act of Congress must be regarded as a direction given by the President. In Wilcox v. Jackson,[18] it was ruled that the President speaks and acts through the heads of the several depart ments in relation to subjects which appertain to their respective duties. Therefore, where, by an act of Congress, all lands reserved from sale by order of the President were exempted from pre-emption, this court ruled that a request for a reservation made by the Secretary of War for the use of the Indian department, must be considered as made by the President within the meaning of the act. The same doctrine was asserted in United States v. Eliason.[19] It may, we think, be properly applied to the present case. While it is true the right of seizure and confiscation grows out of a state of war, the means by which confiscation is effected have a very appropriate relation to the duties of the law department of the government. But whether this is so or not, it is sufficient that the information in this case avers the seizure was made by virtue of the act of Congress. It must, therefore, have been caused by the President.
 
 
 69
 It is next objected that the suit was on the admiralty, and not on the law side of the District Court. The seventh section of the Confiscation Act enacts that the proceedings shall conform as nearly as may be to the proceedings in admiralty or revenue cases. Strict conformity is not required. No doubt in cases of seizure upon land, resort should be had to the common-law side of the court, and such, in substance, was, we think, the case here. Everything necessary to a common-law proceeding in rem is found in the record. An information was filed (called a libel of information, it is true, but still and information), a citation as well as a monition was issued, a default was taken, and, after consideration of the evidence, condemnation was adjudged. What was lacking in this to a common-law proceeding in rem? The principal lack alleged is that there was no jury trial. But in courts of common law on jury is called when there is no issue of fact to be tried. An inquest is sometimes employed to assess damages; but a jury to find facts is never required where there is no traverse of those alleged, and where a defendant has defaulted. What matters it then that the information was called a libel of information, or that the warrant and citation is called a monition? The substance and all the requisites of a common-law proceeding are found in the record. Technical niceties are not required either in admiralty or revenue cases.[20]
 
 
 70
 It is next objected there was no sufficient service of the process; but we think the return of the marshal shows exact compliance with the order of the court directing service, and the manner in which it should be made. The order was that notice be given in two ways to the owner or owners of the property, and all persons interested therein, requiring them to appear and answer the information. The first of these ways was by posting a copy of the order on the front door of the court-house, and the second was by publication, viz., publication of the requirement to appear in the Era newspaper. In the execution of the order the marshal went beyond it. He posted copies of the information, of the warrant, and of the order of the judge, and he published the monition, which was a citation, as he was directed. The service was, therefore, sufficiently made.
 
 
 71
 It is further objected that the information was informal, in that it contained no charge against Slidell, the alleged owner, but that its averments were in the disjunctive. We have already sufficiently answered this. So, too, the absence of any averment that the causes of forfeiture were contrary to the form of the statute or statutes of the United States in such case provided, is no sufficient reason for reversing the judgment of the District Court. Such an averment is required by the twenty-second admiralty rule, but even in admiralty a failure to make it cannot be taken advantage of in a court of errors.[21] The defect is only formal. It is true the absence of such averment in indictments and criminal informations has been held to be a fatal fault, but for reasons inapplicable to civil proceedings, and we need not repeat that the present is a civil case.
 
 
 72
 Another objection urged against the proceedings in the District Court is, that the warrant, citation, and monition was not signed by the clerk of the court. It was attested by the judge, sealed with the seal of the court, and signed by the deputy clerk. This was sufficient. An act of Congress authorized the employment of the deputy, and in general, a deputy of a ministerial officer can do every act which his principal might do.[22]
 
 
 73
 A further objection urged against the adjudication of forfeiture made by the District Court is, that it was made without any finding that the property belonged to John Slidell, or any person included in either of the classes designated in the fifth and sixth sections of the Confiscation Act. This is a renewal of the complaint so earnestly pressed in Miller v. The United States, and which we held to be without foundation. It is said that notwithstanding the default, it was the duty of the court to 'proceed to hear and determine the case according to law, as is directed by the eighty-ninth section of the act of March 2d, 1799,[23] respecting forfeitures incurred under that act.' But were this conceded, of what avail would it be in this case in support of the objection? The court did proceed to hear and determine the case after the default was entered. And it was not until after such hearing and consideration that the property was condemned. This appears by the record. Having heard and considered evidence, it must be presumed the court found that the property belonged to a person engaged in the rebellion, or one who had given aid or comfort thereto, as well as all other facts necessary to the rendition of the judgment. This is a presumption always made in support of judgments of courts after their jurisdiction is made to appear. No rule of law required the District Court to state in detail in its record its findings of fact, and no such practice has prevailed in any court except some which are both of limited and inferior jurisdiction. Nor is it to be considered in a court of error whether the evidence was sufficient to warrant the findings presumed to have been made, and without which the judgment could not have been given. A less degree of evidence is certainly needed after a default. Even in United States v. The Lion,[24] so much relied upon, where a condemnation was sought under an act of Congress which enacted that after the default the court should proceed to hear and determine the case according to law, Judge Sprague said, 'To what extent there must be a hearing must depend on the circumstances of the case.' 'The court,' said he, 'will at least examine the allegations of the libel, to see if they are sufficient in law, the return of the marshal, and such affidavit or affidavits as the district attorney shall submit.' And he added that a wilful omission by the owners to answer might of itself satisfy the court that a forfeiture should be decreed. But without further consideration of this objection, we refer to the opinion delivered in Miller v. United States, to which we still adhere.
 
 
 74
 There remains but one other matter which requires notice. It is contended that the proclamations of amnesty in 1868 amounted in effect to a repeal of the Confiscation Act. To this we cannot assent. No power was ever vested in the President to repeal an act of Congress. Moreover, the property condemned in this case became vested in the United States in 1865, by the judgment of forfeiture, and the sale under the venditioni exponas merely converted into money that which was the property of the government before. No subsequent proclamation of amnesty could have the effect of divesting vested rights. Even the express repeal of a statute does not take away rights of property which accrued under it while it was in force.
 
 
 75
 We have thus reviewed the whole record of the proceedings in the District Court, and we have been able to discover nothing which justified a reversal of the decree of condemnation.
 
 
 76
 JUDGMENT OF THE CIRCUIT COURT REVERSED, and the cause remanded with instructions to
 
 
 77
 AFFIRM THE JUDGMENT OF THE DISTRICT COURT.
 
 Mr. Justice CLIFFORD:
 
 78
 I dissent from the opinion of the court in this case because it is repugnant to the repeated decisions of this court, to the eighty-ninth section of the Collection Act, and to the twenty-ninth admiralty rule of this court, which was adopted as the rule of decision more than thirty years ago; and because it is opposed to the whole current of the decisions of the admiralty courts and to the rules laid down by the most approved writers upon admiralty law.[25]
 
 
 79
 Apart from that, I also adhere upon the merits to the dissenting opinion in the case of Miller v. United States.[26]
 
 Mr. Justice FIELD:
 
 80
 I dissent from the opinion and judgment of the court on the grounds stated in the dissenting opinions in the cases of Miller v. United States, and Tyler v. Defrees, reported in the 11th of Wallace, so far as they are applicable to the facts of this case; and on the further ground that the libel of information is fatally defective in charging no one offence positively, but several offences in the alternative.
 
 
 81
 Mr. Justice DAVIS also dissented.
 
 
 82
 Mr. Justice BRADLEY, not having heard the argument, took no part in the judgment.
 
 
 
 [1]
 12 Stat. at Large, 589.
 
 
 [2]
 Appendix No. 6, Stat. at Large, 1868.
 
 
 [3]
 5 Wallace, 630; and see the Ouachita Cotton Case, 6 Id. 521; and Coppell v. Hall, 7 Id. 542.
 
 
 [4]
 See the case of the Union Insurance Company, the Armstrong Foundry, the St. Louis Foundry, 6 Wallace, 759, et seq.
 
 
 [5]
 See United States v. Hart, Ib. 770; Morris Collier, 8 Id. 508.
 
 
 [6]
 2 Hawkins's Pleas of the Crown, chapter 25, § 58; State v. O'Bannon, 1 Bailey, 144.
 
 
 [7]
 2 Hawkins's Pleas of the Crown, chapter 25, § 116; chapter 26, § 18.
 
 
 [8]
 1 Stat. at Large, 696.
 
 
 [9]
 5 Cranch, 283.
 
 
 [10]
 3 Peters, 57.
 
 
 [11]
 11 Wallace, 268.
 
 
 [12]
 9 Wheaton, 381.
 
 
 [13]
 7 Cranch, 496.
 
 
 [14]
 1 Brockenbrough, 520.
 
 
 [15]
 Vol. 2, p. 383, edition of 1869.
 
 
 [16]
 1 Gallison, 31.
 
 
 [17]
 11 Wallace, 268.
 
 
 [18]
 13 Peters, 498.
 
 
 [19]
 16 Id. 291.
 
 
 [20]
 Samuel, 1 Wheaton, 9; The Hoppet, 7 Cranch, 489.
 
 
 [21]
 The Merino, 9 Wheaton, 401.
 
 
 [22]
 Comyn's Digest, Officer, D., 3.
 
 
 [23]
 1 Stat. at Large, 696.
 
 
 [24]
 1 Sprague, 399.
 
 
 [25]
 The Vengeance, 3 Dallas, 297; The Sarah, 8 Wheaton, 394; 1 Stat. at Large, 696; Admiralty Rules, No. 29; The David Pratt, Ware, 495; Clerke's Praxis, art. 35; The Schooner Lyon, 1 Sprague, 400; 2 Conklin's Admiralty, 2d ed. 178; Benedict's Admiralty, §§ 449, 552; 2 Browne's Civil and Admiralty Law, 401; Dunlap's Practice, 206; 2 Parsons on Shipping and Admiralty, 400.
 
 
 [26]
 11 Wallace, 314.