## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 04 2019, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS
A.J.I AND L.D.M. (FATHERS)

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT
GUARDIAN AD LITEM

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
THE INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
K.R.H. (MOTHER)

Thomas C. Allen
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:

M.I., N.I.[1], N.I.[2], N.I.[3], N.I.[4], S.H.I. *(Minor Children)*

and

A.J.I. *(Father)* and L.D.M. *(Father)*

*Appellants-Respondents,*

February 4, 2019

Court of Appeals Case No. 18A-JT-1948

Appeal from the Allen Superior Court

The Honorable Daniel G. Heath, Judge

Trial Court Cause Nos.
02D08-1710-JT-146
02D08-1710-JT-147

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

and

Dennis Koehlinger,

*Appellant-Guardian ad Litem,*

v.

K.H. *(Mother)*

*Appellee-Respondent.*

02D08-1710-JT-148
02D08-1710-JT-149
02D08-1710-JT-150
02D08-1710-JT-151

**Robb, Judge.**

# Case Summary and Issues

[1] The Indiana Department of Child Services ("DCS") filed a petition to terminate the parental rights of A.J.I. ("Legal Father"), L.D.M. ("Alleged Father") (collectively, "Fathers"), and K.R.H. ("Mother") to Mother's six children. The juvenile court denied the petition as to Mother but terminated Fathers' parental rights. Fathers appeal the termination of their parental rights and the children's

guardian ad litem ("GAL") appeals the juvenile court's denial of the petition as to Mother. This case presents two issues for our review: (1) whether the juvenile court's decision to terminate Fathers' parental rights was clearly erroneous; and (2) whether the juvenile court's judgment denying DCS' petition to terminate Mother's parental rights was contrary to law. We conclude the juvenile court's decision was not clearly erroneous as to Fathers but its denial of DCS' petition as to Mother was contrary to law. Accordingly, we affirm in part, reverse in part, and remand.

# Facts and Procedural History

[2] Six of Mother's children, born from March 18, 2005 to January 1, 2014, are the subject of this appeal (collectively the "Children"). Mother and Legal Father were married in 2004 and divorced in 2015. He is the father of the five oldest children. The youngest child, S.H.I., was born during the marriage, but Alleged Father is believed to be her father, although his paternity has not been established.

[3] In 2014, Legal Father was convicted of child molesting, a Class A felony. None of the Children were the victim of the molestation. Legal Father was sentenced to thirty-five years with twenty years executed and fifteen years suspended with five years of probation. He is expected to be released in July 2023. Alleged Father was also incarcerated from 2013 through March 2018. Mother was the primary caretaker of the Children while Fathers were incarcerated. On or around November 20, 2015, Mother visited the DCS office

and stated she was unable to care for the Children due to lack of housing and her alcohol addiction. At this time, Mother admitted to DCS she was an alcoholic and became intoxicated every night. Ten days later, the Children were placed with their maternal great aunt, A.H.

[4] On December 2, 2015, DCS filed a petition alleging the Children were Children in Need of Services ("CHINS") and the same day, the juvenile court held an initial/detention hearing and the Children were formally removed from Mother and placed with A.H. Mother was permitted to reside with A.H. and the Children. The juvenile court also appointed Denis Koehlinger as the Children's GAL.

[5] DCS filed an amended petition alleging Mother was unable to care for Children due to her lack of housing and alcohol addiction, and that both Fathers were incarcerated, on January 6, 2016. A hearing was held on January 11 at which Mother and Alleged Father admitted to the allegations in the amended petition[1] and the Children were adjudicated CHINS. The juvenile court entered a dispositional decree ordering Mother to: participate in Narcotics Anonymous and/or Alcoholics Anonymous; obtain a drug and alcohol assessment and follow all recommendations; submit to random drug screens; obtain and maintain suitable housing and employment; complete parenting classes; complete family and individual counseling at Stop Child Abuse and Neglect;

---

[1] Legal Father did not attend the hearing due to his incarceration.

and attend visitation with Children. Alleged Father was also ordered to participate in services available to him, including parenting services, therapy to address domestic violence and substance use, and other preventative services. *See* Exhibits at 31-32.

[6] In June, A.H. moved to another city and the Children were placed in foster care. Legal Father subsequently admitted to the allegations of the CHINS petition and the juvenile court took judicial notice that Mother and Alleged Father previously admitted to those allegations at the January 11 hearing. The juvenile court ordered Legal Father to maintain contact with DCS, provide the Children with clothing, and participate in services available to him while incarcerated, including parenting classes and therapy to address domestic violence and substances abuse issues, and other available preventative services. *See* Exhibits at 61-62.

[7] On April 27, 2017, the juvenile court conducted a review hearing and found that Mother had not visited regularly with the Children, had been unable to maintain stability, and still needed to participate in counseling and home-based services. The juvenile court also found that Mother had obtained a psychological evaluation, results thereof were pending, and the service providers had identified "possible mental health needs." Exhibits at 68. At that time, the permanency plan for Children was reunification with Mother, but the juvenile court ordered the Children to be continued in foster care.

[8] DCS filed its Verified Petition to Terminate the Parent-Child Relationship between Mother and Children, and between Fathers and Children on October 4. At a permanency hearing on October 23, the juvenile court found that Mother, Legal Father, and Alleged Father had all "failed to enroll or satisfactorily participate in the services and programs required in the dispositional decree." Exhibits at 84. On March 21, 2018, DCS filed an amended petition naming L.D.M. as the Alleged Father of S.H.I. and A.J.I. as the Legal Father of S.H.I.

[9] The juvenile court held fact finding hearings on the petition over several days in May and took the matter under advisement. On July 17, the juvenile court denied DCS' petition to terminate Mother's parental rights but terminated Legal Father's and Alleged Father's parental rights. Fathers appeal the termination of their parental rights and the GAL appeals the juvenile court's denial of the petition to terminate Mother's parental rights. Additional facts specific to each party will be provided as necessary.

# Discussion and Decision

## I. Standard of Review

[10] A parent's right to establish a home and raise his or her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id*. (quoting *Troxel v. Granville*, 530

U.S. 57, 65 (2000)). Although the parent-child relationship is "one of the most valued relationships in our culture[,]" parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *In re G.Y.*, 904 N.E.2d 1257, 1259-60 (Ind. 2009). The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.

[11] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.*

[12] Pursuant to Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions thereon. Accordingly, we apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id.* We will set aside the juvenile court's judgment only if clearly erroneous, namely when the findings "do not support the [juvenile] court's conclusions or the conclusions do not support the judgment." *Id.*

## II. Termination of Parental Rights

[13] To terminate a parent's rights, the State must prove by clear and convincing evidence:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2); *see also* Ind. Code § 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence."). Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS is only required to prove one of three elements of subsection (B). *In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). We analyze each party's arguments on appeal separately.

# III. Fathers' Appeal

## A. Legal Father

Legal Father does not challenge the juvenile court's findings but argues that the findings do not support its decision to terminate his parental rights. Specifically, he challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that led to removal of the Children would not be remedied and that the continuation of the parental-child relationship poses a threat to the well-being of the Children.[2]

As to Legal Father, the juvenile court found:

> 112. On July 14, 2014, [Legal Father] was convicted of child molesting, an A felony. The sentence was for thirty-five (35) years, with twenty (20) years to be executed with the balance of fifteen years (15) were suspended. The anticipated release from prison date . . . is July 19, 2023. When he is released from prison in 2023, he will have five (5) years of probation. Following his release, he will be on the child molestation registry for ten (10) years and he must participate in a program for sex offenders. . . . Furthermore, his divorce agreement requires that visitations with his children must be supervised.

> 113. [Legal Father] has not been physically in the presence of his children since the day he began his incarceration . . . July 17, 2014. He has seen some pictures of them, provided to him by family members. He has sent them birthday presents and cards. He made them hand-crafted items for his [C]hildren. He has had

---

[2] Fathers appeal the termination of their parental rights collectively.

phone contact once with his [C]hildren since the beginning of his incarceration. He has had no contact whatsoever with them for the past eighteen (18) months for the reason that he does not know where they are residing.

114. That last time that [Legal Father] was physically in the presence of his [C]hildren was October 7, 2013 . . . .

115. Due to his incarceration, [Legal Father] cannot provide the necessary care and supervision of his [C]hildren.

116. Under the Court's dispositional plan for [Legal Father], [he] has been unable to provide "clean, appropriate clothing at all times" for his [C]hildren.

117. [Legal Father's] plan for employment, upon his release from prison, includes working at Ellison Bakery with his mother, obtaining his CDL so that he can become a long-haul truck driver, and starting his own music record label.

118. His plan for housing, upon his release from prison, he will reside with either his mother or his step-father, both of whom reside in Fort Wayne. Regarding the deed to his mother's house, [his] name is on the deed as well as his mother and his brother. He does not own a home solely in his name.

119. Regarding the requirement that [he] participate in parenting classes and therapy to address domestic violence and substance abuse issues, also a requirement of the Dispositional Order in the CHINS case involving [Legal Father] and his children, [he] has completed a program titled "Resolution for Men" which is a Christian-based parenting program offered at the New Castle Correctional Facility. He is on the waiting list for a program called "Navigators" which is designed to help you become a

better person. He has also taken some "therapeutic" classes to deal with domestic violence. He cannot take any substance abuse classes until he has some twenty-five (25) months left of his period of incarceration.

120. In a program promoted by the U.S. Department of Labor, [Legal Father] is working to become a Master Student/Master Employee with an eye toward "culinary arts." He has maintained employment while incarcerated.

121. While [Legal Father's] earliest possible release date, as of the date of the trial, is July 19, 2023, he can receive "time cuts" by completing certain programs. He has earned one, 6 month "time cut" so far and is set to complete another program for another "time cut" when he returns to the New Castle Correctional Facility.

122. [Legal Father] intends to carry on a relationship with his children upon his release from prison.

123. [Legal Father] has advised the DCS that if the children are not placed with [Mother], that his children be placed with either his family or [Mother's] family.

* * *

[T]he court finds that, due to his incarceration, [Legal Father] is unable to provide the necessary care, supervision and material financial support for his [C]hildren. He is expected to remain incarcerated for the next four (4) to four and one-half (4 and ½) years. He has had little contact with [his] [C]hildren since the commencement of his incarceration. His inability to provide for his [C]hildren's care, supervision and material financial support will not be remedied until his release date and possibly beyond.

> Most of the childhood years of [his] [C]hildren at issue will be gone by the time of his release. Furthermore, his incarceration stems from his conviction of an A felony for child molestation. Therefore, as he is a convicted child molester, there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the aforementioned children, under Indiana Code section 31-35-2-4(b)(2)(ii). The court concludes that [DCS] has met its burden by clear and convincing evidence that terminating the parental rights of [Legal Father] is in the best interests of the aforementioned children.

Appealed Order at 20-23. (citations omitted).

[16] First, we note that Legal Father does not dispute any of the juvenile court's findings of fact pertaining to him and we accept those unchallenged findings as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). We therefore address only whether the juvenile court's findings support its judgment. *Bester*, 839 N.E.2d at 147.

[17] As to remedied conditions, Legal Father alleges that DCS became involved with the Children while he was incarcerated when Mother sought help due to her lack of housing and alcohol addiction, impacting her ability to care for the Children. Thus, he argues he was "not responsible for the conditions which led to the removal" of the Children. Brief of Appellant(s)/Father(s) at 17-18.

[18] In determining whether a reasonable probability exists that the reasons for removal or placement outside the home will not be remedied, we engage in a two-step analysis. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind.

2015). We first identify the conditions that led to removal, then we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* As to the second step,

> the [juvenile] court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. The [juvenile] court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Pursuant to this rule, courts have properly considered evidence of a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. The [juvenile] court may also properly consider the services offered to the parent by [DCS] and the parent's response to those services as evidence of whether conditions will be remedied. Finally, [DCS] is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change.

*In re I.A.,* 903 N.E.2d at 154 (citations and emphasis omitted).

[19] We begin with the conditions that led to removal or reasons for placement outside of the home. The record reveals that the Children were initially removed from Mother on November 30, 2015, after she appeared at the DCS office and admitted she was unable to care for the Children due to lack of housing and her alcohol addiction. At this time, both Fathers were incarcerated and unable to care for the Children. Here, the juvenile court found that Legal Father is unable to provide the necessary care, supervision, and financial support for his Children due to his incarceration and his inability to do so "will

not be remedied until his release date and possibly beyond." Appealed Order at 23, ¶ 4.

[20] As to whether those conditions will be remedied, we first acknowledge that our supreme court has held that incarceration itself is an insufficient basis for terminating parental rights. *In re G.Y.*, 904 N.E.2d at 1264-66. Legal Father asserts that he has made "significant steps towards his rehabilitation" during his incarceration and thus the juvenile court erred in concluding it is unlikely he will remedy the conditions. Br. of Appellant(s)/Father(s) at 18. In contrast, DCS contends the conditions will not be remedied given Legal Father's "limited contact" with the Children, his child molestation conviction prohibiting him from having unsupervised contact with the Children, and the fact that he will be incarcerated until 2023. Brief of Appellee at 21.

[21] DCS distinguishes Legal Father's progress from the progress demonstrated by the incarcerated father in *K.E. v. Ind. Dep't of Child Servs.,* 39 N.E.3d 641 (Ind. 2015), whose parental rights were also terminated. In *K.E.*, our supreme court reversed the termination of father's parental rights given father's "substantial efforts towards bettering his life" by participating in twelve programs during his incarceration, most of which were voluntary and did not result in a sentence reduction. *Id.* at 648. In addition, the father participated in visitation with his children every other week and made nightly phone calls to his children. *Id.* at 649. Overall, the father in *K.E.* made "great strides" during his incarceration. *Id.*

[22] Based on Legal Father's minimal contact with the Children, we agree with DCS that Legal Father's efforts can be distinguished from those in *K.E.*. First, Legal Father's absence from the Children's lives predates his incarceration. The juvenile court found the last time Legal Father was physically present with his Children was in October 2013, approximately eleven months before he was incarcerated in July 2014. Second, although he has sent birthday presents, cards, and hand-crafted items, he has had phone contact once since his incarceration and has not had any contact with the Children in the last eighteen months. Legal Father argues the juvenile court "did not give appropriate weight to the fact that [he] was likely to receive additional 'time cuts' for completion of [Department of Correction] programs." Br. of Appellant(s)/Father(s) at 18. Legal Father's assertion is a request to reweigh the evidence, which we cannot do. *Lang*, 861 N.E.2d at 371.

[23] We commend Legal Father on his efforts to better himself. However, given his minimal contact with the Children, we cannot conclude the juvenile court erred in determining the conditions which led to the Children's removal are likely to be remedied.[3]

---

[3] Given that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS only had to prove one of three elements of subsection (B). *In re I.A.*, 903 N.E.2d at 153. Thus, because we conclude that the juvenile court's determination that a reasonable probability exists that the conditions which led to Children's removal will not be remedied is not clearly erroneous, we need not address Legal Father's argument regarding (b)(2)(B)(ii).

# B. Alleged Father

Alleged Father appeals the termination of his parental rights as to S.H.I. The juvenile court found:

> 109. [Alleged Father] has only seen [S.H.I.] twice: once while in jail and once while [S.H.I.] was in the case [sic] of [Mother]. During the time [S.H.I.] was in [Mother's] care, [Alleged Father] has not provided any financial assistance for [S.H.I.].
>
> 110. [Alleged Father] has made no contact with DCS since his release from incarceration and has provided no evidence of compliance with the requirements of his Court-ordered Parent Participation Plan.
>
> * * *
>
> [Alleged Father] did not appear for trial though he was released from incarceration prior to trial. Furthermore, he had previously admitted that he was unable or unwilling to provide the necessary care and supervision for [S.H.I.]. Furthermore, he admitted that he is unable or unwilling to provide material financial support for [S.H.I.]. [Alleged Father], therefore, has abandoned [S.H.I.]. [DCS] has shown, by clear and convincing evidence, that his abandonment is unlikely to be remedied, that whether [Mother] ultimately regains custody or control of her [C]hildren or the [C]hildren are ultimately adopted, [DCS] has or will have a satisfactory plan for the care and treatment of the [C]hildren, and it is in the best interests of [S.H.I.] that the parental rights of [Alleged Father] as to [S.H.I.] be terminated.

Appealed Order at 20, 23.

[25] Alleged Father challenges the finding that he has abandoned S.H.I., a condition the juvenile court concluded was unlikely to be remedied. His only argument is that the evidence at trial demonstrates that he had been incarcerated throughout the pendency of the CHINS matter and was released just before the termination proceedings, thus the evidence does not support the termination of his parental rights.

[26] DCS, however, argues the juvenile court did not find legal abandonment nor did DCS have to prove the requirements thereof. And moreover, DCS argues that the evidence supports the conclusion that Alleged Father is unlikely to remedy the conditions for placement of S.H.I. outside of the home "in part because he essentially abandoned" S.H.I. Br. of Appellee at 23.

[27] Again, we engage in a two-step analysis to determine whether the conditions that led to S.H.I.'s removal and continued placement outside of the home will likely be remedied. *K.E.*, 39 N.E.3d at 647. We first identify the conditions that led to removal, then whether a reasonable probability exists that those conditions will not be remedied. *Id.* Children were removed due to Mother's lack of housing and alcohol addiction resulting in her inability to care for the Children.

[28] The evidence shows that Alleged Father was incarcerated from 2013 to approximately March 2018.[4] Deondra Bender, family case manager, testified that she communicated with Alleged Father while he was incarcerated, but "not often." Transcript, Volume 2 at 36. The communication was typically via telephone "only on court hearing dates when possible." *Id.*

[29] The record reveals that DCS sent Alleged Father a letter upon his release, "asking him to please contact [DCS] to discuss the case that he's involved in" and provided the necessary contact information. Tr., Vol. 1 at 228. The DCS case manager testified that she contacted Allen County Adult Probation where he was released and believed she had a correct address for Alleged Father. Alleged Father has not had any contact with DCS since his release, has not provided S.H.I. with any clothing as ordered, or provided any evidence to demonstrate his compliance with the Parent Participation Plan. Furthermore, Alleged Father has only seen S.H.I. twice since her birth and the juvenile court found that he "failed to appear throughout the proceedings on the petition." Appealed Order at 2.

[30] We note that a "parent's failure to appear for . . . court hearings reflects ambivalence[.]" *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). The

---

[4] The exact date of Alleged Father's release is unclear. The GAL testified at the May 31, 2018 hearing that Alleged Father had been released from incarceration "relatively recent[ly]." Transcript, Volume 2 at 71. He was unsure as to when, but believed it was within the last couple of months. *Id.* In addition, the DCS family case manager testified that she sent Alleged Father a letter in March 2018 "shortly after he was released[.]" Tr., Vol. 1 at 228.

evidence in the record supports the juvenile court's finding that Alleged Father has abandoned S.H.I. His lack of effort to reach out to DCS or attend a single termination hearing supports the conclusion that this condition is unlikely to be remedied.

## C. Best Interests

[31] Fathers both argue the juvenile court's determination that termination of their parental rights is in the Children's best interests was clearly erroneous. To determine the best interests of the Children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. "A child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the child's guardian ad litem supports a finding that termination is in the child's best interests." *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*.

[32] Here, the Children's GAL testified that he believed it was in the best interests of the Children for Fathers' parental rights to be terminated. Tr., Vol. 2 at 64. Thus, the juvenile court's determination that termination of Father's parental rights is in the best interests of the Children is not clearly erroneous.

## D. Satisfactory Plan

[33] Fathers also challenge the juvenile court's finding that DCS "has or will have a satisfactory plan for the care and treatment of the [C]hildren[.]" Appealed Order at 23. A DCS plan is satisfactory when the plan is to attempt to find

suitable parents to adopt the children. *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. We will not find a plan unsatisfactory simply because DCS has not yet identified a specific family to adopt the children. *Id*. There need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id*. Similarly, a plan does not need to be detailed, so long as it offers a general sense of the direction in which the children will be going after the parent-child relationship is terminated. *In re D.D.*, 804 N.E.2d at 268.

[34] At the termination hearing, Amanda Ray, DCS case manager, testified that DCS has a plan for the care and treatment of the Children, namely adoption. *See* Tr., Vol. 1 at 229-30. She testified that DCS "would continue to provide for the children in the foster care. . . until they could be safely adopted or successfully adopted." *Id*. at 230. She also testified that DCS would like to place all Children in a single adoptive home although it would be difficult. *See id*. at 233. Thus, the juvenile court's determination here was not clearly erroneous.

# IV. GAL's Appeal

[35] The GAL appeals the juvenile court's denial of the DCS petition to terminate Mother's parental rights as to Children. Here, the juvenile court found: (1) that Mother's alcohol addiction and inability to control the Children has been or is likely to be remedied; (2) Mother's lack of housing has not been remedied; and (3) DCS failed to prove that termination was in the Children's best interests.

The GAL appeals. The juvenile court entered over eighty findings of fact pertaining to Mother and concluded, in pertinent part:

5. [T]he court notes that [Mother] has failed to complete her treatment through AA, and DBT and CBT treatment through Park Center. Furthermore, she has had difficulty maintaining stable employment though she has had consistent employment through temporary employment agencies. While it would obviously better [sic] for [Mother] to have successfully completed her treatment plans and to have had a better employment history, the court cannot conclude that these factors meet the burden [DCS] has by clear and convincing evidence that [Mother's] parental rights should be terminated. The court makes this conclusion despite the testimony of Dr. Lombard [Licensed Clinical Psychologist] that [Mother] should not have the care and custody of her [C]hildren until such time as she is "compliant" with treatment. The treatment required under the Parent Participation Plan when considered in the context of her need to also find stable employment and housing, is difficult to accomplish, especially for someone without personal transportation.

6. Furthermore, it would appear that [Mother] has gained control, for the most part, of her alcohol and drug addiction. The court makes this finding despite the evidence that she did test positive for THC on one occasion and admits to two occasions of alcohol abuse during the pendency of this matter. Therefore, this problem has been, for the most part remedied.

7. Another concern expressed by [Mother] to DCS staff was her inability to control her [C]hildren. While this problem has not yet been totally remedied, she has completed parenting classes and has shown sufficient progress in the improvement of her parenting skills, as demonstrated during her visitations, that the court concludes that remedying this concern is a good possibility.

8. The final issue for the court's consideration that must be remedied is the lack of suitable housing for [Mother] and her [C]hildren. [Mother] originally appeared at the DCS office complaining of her inability to control her alcohol addiction, probably [sic] control and supervise her [C]hildren, and to provide housing for them. She was able to gain some period of time for housing with [A.H.] until approximately June 1, 2016, when [A.H.] moved out-of-state. Since that time [Mother] has been unable to secure suitable housing . . . . She has been at "Transitions," "Vincent Villages," and various hotels and with friends. Furthermore, she has admitted, and makes clear by her own testimony, that it is very difficult for her to secure housing because of her credit history and the size of her family. She would likely be able to secure food stamps again and obtain Medicaid coverage for the [C]hildren if her [C]hildren are restored to her, but this would not remedy her ability to secure suitable housing. She has been making attempts during the entire time since her [C]hildren were removed from her care and custody, June 1, 2016. It has, therefore, been more than two (2) years that [Mother] has been making the attempt without success. The problem of housing is the essential problem that [Mother] must remedy to have her [C]hildren restored to her.

9. On the other hand [DCS] presented no evidence that waiting in the wings are real prospective adoptive parents. Children, as in this case, ages 13, 12, 11, 9 and so on, with some behavioral issues (as was shown in this case) are likely not easily adopted. Put differently, though [Mother] may continue to struggle to secure ample housing for her family, so might [DCS] struggle to find adoptive parents. Furthermore, it is also apparent from the evidence that there is a strong, loving bond between [Mother] and her [C]hildren[.]

10. Therefore, though it may continue to be difficult for [Mother] to secure suitable housing[,] . . . the court cannot yet conclude that it would be in the best interests of the [C]hildren

that [Mother's] parental rights be terminated. [DCS] has failed to show by clear and convincing evidence that it would be in the best interests of the [C]hildren at issue in this case that [Mother's] parental rights should be terminated.

Appealed Order at 24-25.

[36] Because the GAL is faced with a ruling against the termination of Mother's parental rights, it must "overcome the additional burden of appealing from a negative judgment." *In re D.Q.*, 745 N.E.2d 904, 909 (Ind. Ct. App. 2001). Where a party has the burden of proof at trial and an adverse judgment is entered, if the party prosecutes an appeal, he or she does so from a negative judgment. *J.W. v. Hendricks Cty. Office of Family & Children*, 697 N.E.2d 480, 481 (Ind. Ct. App. 1998). To prevail on an appeal from a negative judgment, the appellant must demonstrate that the judgment is contrary to law. *In re D.Q.*, 745 N.E.2d at 909. "A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from that evidence lead to but one conclusion, but the juvenile court reached a different conclusion."[5] *Id.*

[37] The GAL's standing is aligned with DCS in this instance. *See* Ind. Code § 31-35-2-4(a) (a petition to terminate the parent-child relationship may be filed by a child's GAL, DCS, or child's court appointed special advocate); *see also Bester*,

---

[5] We note that our standard of review in termination matters is already whether the judgment is contrary to law. *See supra* ¶ 12. However, because the GAL appeals from a negative judgment, the "contrary to law" standard is slightly different.

839 N.E.2d at 148 (the State bears the burden of proving the allegations of the petition to terminate parental rights by clear and convincing evidence).  The GAL represented the Children at the termination hearings, testified that termination is in their best interests, and subsequently initiated this appeal after the juvenile court denied DCS' petition to terminate Mother's parental rights.  Thus, the GAL appeals from a negative judgment and must demonstrate that the juvenile court's judgment is contrary to law.

## A.  Remedy of Conditions

[38]  The GAL takes issue with the juvenile court's determination that the conditions which led to the Children's removal have been or will be remedied.  We note, however, that the juvenile court did not explicitly find that DCS failed to meet its burden by clear and convincing evidence under Indiana Code section 31-35-2-4(b)(2)(B).  Rather, the juvenile court found that the Children were initially removed from Mother after she appeared at DCS notifying them she was unable to care for the Children due to her lack of housing, inability to control the Children, and her alcohol addiction.  As to remedied conditions, the juvenile court entered specific findings pertaining to each condition.  It concluded that Mother's alcohol and drug addiction "for the most part" has been remedied and her inability to control her Children "has not yet been totally remedied" but remedying this is a "good possibility" given her progress.  Appealed Order at 24.  However, it also found that Mother has attempted to find housing for more than two years without success, thus the "problem of housing is the essential problem that [Mother] must remedy to have her

[C]hildren restored to her." *Id.* Even if Mother has remedied her alcohol addiction and inability to control the Children, the juvenile court still found she did not remedy her lack of housing.

To the extent the GAL challenges a general determination under Indiana Code section 31-35-2-4(b)(2)(B)(i) that there is a reasonable probability that the conditions that led to Children's removal will be remedied, there is no such finding in the Appealed Order. *See* Appealed Order 24-25, ¶ 5-10. Because the juvenile court found that Mother did not remedy *all conditions* that led to the Children's removal, we conclude that DCS met its burden under Indiana Code section 31-35-2-4(b)(2)(B).

## B. Best Interests

The GAL challenges the juvenile court's finding that the termination of Mother's parental rights is not in the Children's best interests, highlighting Mother's pattern of instability. Here, the juvenile court recognized that Mother's lack of housing has not been remedied, but concluded:

> 9. On the other hand [DCS] presented no evidence that waiting in the wings are real prospective adoptive parents. Children . . . ages 13, 12, 11, 9 and so on, with some behavioral issues . . . are likely not easily adopted. Put differently, though [Mother] may continue to struggle to secure ample housing for her family, so might [DCS] struggle to find adoptive parents. Furthermore, it is also apparent from the evidence that there is a strong, loving bond between [Mother] and her [C]hildren.

10.  Therefore, though it may continue to be difficult for [Mother] to secure suitable housing for herself and her family, the court cannot yet conclude that it would be in the best interests of the [C]hildren that [Mother's] parental rights be terminated. [DCS] has failed to show by clear and convincing evidence that it would be in the best interests of the [C]hildren at issue in this case that [Mother's] parental rights should be terminated.

Appealed Order at 24-25.

[41]    "Permanency is a central consideration in determining the best interests of a child." *G.Y.*, 904 N.E.2d at 1265.  To determine the best interests of the children, the juvenile court must look beyond the factors identified by DCS and to the totality of the evidence.  *In re D.L.*, 814 N.E.2d at 2030.  In doing so, the juvenile court must subordinate the interests of the parent to those of the children involved and need not wait until a child is irreversibly harmed before terminating parental rights.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[42]    Here, the juvenile court acknowledged that Mother has not been able to obtain suitable housing in over two years and found that it is an "essential problem that [Mother] must remedy to have her [C]hildren restored to her."  Appealed Order at 24.  At the hearing, Mother's family coach testified that Mother made no progress pertaining to her goal of attaining suitable housing.  *See* Tr., Vol. 1 at 20.  She explained that she went with Mother to look at various housing options and Mother filled out applications, but ultimately made "no progress." *Id*.  The record reveals that Mother was living "[i]n and out of hotels" in

February 2018 and was living with her sister at the time of the termination hearings. *Id.* Moreover, Mother testified that she has not been able to obtain housing, but her boyfriend was currently looking for housing and it is difficult to find a place big enough for her family. She also testified that her boyfriend has a Section 8 voucher and anticipated moving "within the next month." *Id.* at 167. However, Amanda Ray, DCS case manager, explained that any adults in the home with the Children would have to pass background checks through DCS and the hearing was the first time she heard Mother indicate she intended to live with her boyfriend. Mother stated her boyfriend had not yet met the Children or had a background check and she was aware he had a criminal history. The evidence that Mother is unable to obtain suitable housing for herself and the Children is "without conflict and all reasonable inferences to be drawn from that evidence" lead us to conclude that termination of Mother's parental rights is in the best interests of the Children as the Children would effectively become homeless if returned to Mother.[6] *In re D.Q.*, 745 N.E.2d at 909.

---

[6] The GAL appears to take issue with the juvenile court's finding that DCS "presented no evidence that waiting in the wings are real prospective adoptive parents. Children . . . with some behavioral issues . . . are likely not easily adopted." Appealed Order at 24. The GAL argues the "fact that the plan for the Children may be time consuming or difficult . . . should not deter the termination of Mother's parental rights to allow DCS to attempt to fashion a permanent solution for these Children." Brief of Appellant/Guardian Ad Litem at 21. Because the juvenile court found that DCS has or will have a satisfactory plan for the care and treatment of the Children, we need not address this issue.

# Conclusion

[43] For the foregoing reasons, we affirm the juvenile court's judgment terminating Fathers' parental rights and reverse the judgment of the juvenile court denying DCS' petition as to Mother. We remand to the juvenile court to enter a judgment consistent with this opinion terminating Mother's parental rights as to Children.

[44] Affirmed in part, reversed in part, and remanded.

Riley, J., and Kirsch, J., concur.